# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | No. 16-cr-686 |
| v. ) | |
| ) | Judge Robert M. Dow, Jr. |
| DAVID SANTIAGO ) | |

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant David Santiago's motion to suppress [49]. For the reasons set forth below, the Court grants in part and denies in part Defendant's motion [49].[1] At trial, the Government may use evidence found in the bedroom occupied by Defendant at 2444 W. Marquette and has agreed that it will not seek to admit evidence found in another bedroom of the residence. This case remains set for status hearing on July 12, 2018 at 9:00 a.m.

**I.     Background**

The superseding indictment in this case charges Defendant with being a felon in possession of ammunition and firearms in violation of 18 U.S.C. § 922(g)(1) (Counts Two and Four); distributing heroin in violation of 21 U.S.C. § 841(a)(1) (Count Three); and possessing heroin with intent to distribute in violation of 21 U.S.C. § 841(a)(1) (Count Five). See [59]. These charges arise from Defendant's April 6, 2016 arrest by Chicago Police Department ("CPD") officers and a subsequent search of Defendant's residence. The relevant facts, drawn primarily from information contained in sworn police reports and recorded conversations, are essentially undisputed for purposes of this motion. The parties have stipulated that an evidentiary hearing is not required to resolve Defendant's motion to suppress. See [66].

---

[1] The motion filed as Docket Entry [48], which appears to be a duplicate of Docket Entry [49], is denied as moot.

On April 6, 2016, Defendant and a confidential source cooperating with law enforcement ("CS") exchanged a series of telephone calls in which they discussed arrangements for the CS to purchase firearms from Defendant. The calls were recorded. At approximately 6:40 p.m., Defendant and the CS agreed to meet at the "same place as last time," referring to a residence at 2444 West Marquette in Chicago, Illinois ("2444 W. Marquette"). [53] at 2. At approximately 6:50 p.m., CPD officers met the CS, equipped him with audio-video recording equipment, and provided him with $1,500.

At approximately 7:44 p.m., law enforcement conducting surveillance saw the CS arrive at 2444 W. Marquette, meet Defendant at the door, and enter the residence. At approximately 7:53 p.m., the CS exited the residence and, shortly thereafter, met with CPD officers. The officers recovered two firearms from the CS. The CS told the officers that he purchased two firearms (one .45 caliber Smith and Wesson handgun and one Smith and Wesson .38 caliber revolver) from Defendant in exchange for $1,200. The CS reported that Defendant possessed another firearm that he carried in his waistband and that, when the CS entered Defendant's bedroom, "he saw a lot of guns on the bed." [53] at 3. The CS stated that two other black males were also in Defendant's bedroom and were looking to purchase firearms.

At approximately 8:06 p.m., law enforcement observed two black males exit the same residence, get into a 2015 black Chevy SUV, and drive away. One of the men appeared to be carrying a gun case, which he placed on the passenger floorboard of the car. Four minutes later, law enforcement stopped the car, identified the driver and passenger, and recovered four firearms: three from the center console, and one from the passenger floorboard in a gun box.

At approximately 10:00 p.m., officers observed Defendant leave 2444 W. Marquette with an unknown female, later identified as Erica Reeves ("Reeves"). Defendant immediately entered

on the driver's side of a 2015 Nissan Rogue, Reeves occupied the front passenger seat, and the two drove away from the residence.

About ten minutes later, CPD officers stopped Defendant's vehicle. While approaching the vehicle, the officers observed Defendant place a semi-automatic handgun between Reeves' legs. The officers asked Defendant and Reeves to exit the vehicle. According to the police reports, when Defendant got out of the vehicle, he immediately stated, "that is my gun, she has nothing to do with it." [53] at 4. The officers arrested Defendant and took him to the 8th District.

At the 8th District, four CPD officers and one agent for the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") interviewed Defendant. CPD officers placed Defendant into a room to commence an interview, which was audio recorded and later transcribed.[2]

Agent 1 asked Defendant if he could read and write and Defendant responded in the affirmative. Agent 1 provided Defendant with an "advice of rights" form and told him that he had the right to remain silent, that anything he said could be used against him in court, and that he could talk to a lawyer before speaking with the officers. Defendant was not advised that, if he could not afford a lawyer, one would be appointed to represent him. Defendant told the officers that he would "rather have a lawyer" and that "you can talk but I don't want to stay without a lawyer." Tr. 1:18-20. Agent 1 asked Defendant if he had a lawyer he could call, and Defendant responded no.

Officer 2 then told Defendant "what our next steps are." Tr. 1:26. Officer 2 explained: "We're going to go over what the steps are. Ok? We're first going to advise you that—if you are going to sign the consent to search for your vehicle, for your house. We're going to search those things. Ok? If you don't sign the consent to search, we're going to get a warrant for those

---
[2] The transcript refers to the ATF Agent as "Agent 1" and the CPD Officers as "Officers 1, 2 and 3."

3

items, and then we're going to search them anyways. But we're going to arrest and charge you for any, for any of those things we find[.] So if you perhaps want to sign the consent to search then we should just do it, get it over with. If you don't [unintelligible] get a search warrant and we search through your things anyways. Car, house[.] We saw you, we saw you leave the house with that pistol. Ok?" Tr. 1:29-2:39. Officer 2 continued: "So we're going through that house whether it's with your cooperation or not. However, it's in your best interest that we do it with your cooperation. Is there anybody else in that house?" Tr. 2:42-44. Defendant responded that "somebody's in there." Tr. 2:47. Officer 2 asked Defendant if there were any drugs in the house, and Defendant responded no. Officer 2 also asked if there were any dogs in the house, and Defendant said there were dogs and that they're "good dogs." Tr. 2:60. Officer 2 said "[w]e're dog lovers so don't worry about that." Tr. 2:62.

After asking a few questions about what Defendant did for a living, Officer 2 asked, "[s]o, are you willing to cooperate or should we go ahead and get the judge to sign the warrant and search the stuff on our own?" Tr. 3:74-75. Defendant responded, "I don't know." Tr. 3:76. Officer 2 came back, "I mean you don't understand either way we are going to search whatever cars are over there and we're going to search the house you came out of. There's *** no getting around that. We prefer your cooperation because that's easier on you and it's easier on us." Tr. 3:77-80. Defendant stated: "Yeah, you guys can search it but it don't matter really. I can't say nothing or do nothing, so [unintelligible] there's some other guys that live there that don't need to be involved in it." Tr. 3:85-87. Officer 2 told Defendant: "If we do a warrant from a judge and we hit that house, then they're involved in it. If you do a consent to search and you tell us that the person that's in the house isn't involved in it, then maybe they [unintelligible]. However, if we get a search warrant signed by the judge and we execute it and there's people in

the house then they are going to be involved. That's just, that's just the way it works." Tr. 3:89-94. The officers and Defendant then had the following exchange:

> Defendant: I dunno, I need a lawyer, you'll have to ask him.
> Officer 1: Ok, well we're going to pursue the search warrant then.
> Defendant: I mean I can't talk to a lawyer?
> Officer 1: Well, you can talk to a lawyer, but you have to understand that we're not going to wait for that to see the judge.
> Officer 2: Can't, can't wait, we got to do it.

Tr. 3: 95-100.

Officer 1 showed a search warrant for 2444 W. Marquette. Officer 3 asked, "Ain't that your residence"? Tr. 4:106. Defendant responded, "I got a room there, that's it." Tr. 4:107. Officer 1 asked, "Do you want to sign a consent to search or not?" Tr. 4:108. Officer 3 added: "I'm telling ya. Ok? As of right now, you have an opportunity to help yourself in this situation. Once we execute this, we want to make a friend here, not an enemy. Once we execute this our thing is we have no more discretion. Discretion's out the door because the judge says to go get it. You sign the consent." Tr. 4:111-115. Defendant asked to see the warrant. It is unclear from the transcript whether he was allowed to see it. Defendant said "I don't live there." Tr. 4:22. Officer 3 responded: "We're past that point. We, we already know [unintelligible]. You want us to go there, you're, you're going to be involved no matter what. It's a done deal whether you're involved or not. Now it's better if you don't want [unintelligible] people that live there are going to be involved as well. By you signing consent, you're saying they had nothing to do with this. Then that gives us leeway." Tr. 4:126-31. They continued:

> Officer 3: It, it'll help them and it'll help you.
> Defendant: They don't, they don't have nothing to do with what I do.
> Officer 1: Ok. Do you want to sign this, the consent? Yes or no? Just yes or no.
> Defendant: Sure.

Tr. 5:135-138.

5

Defendant signed the consent to search. He stated, "You're searching my room and that's the only room that's mine that I only go into." Tr. 5:144-145. Officer 2 responded, "Oh ok." Tr. 5:146. Defendant also asked if on the consent, "can you put a slash my room," and Officer 2 responded, "OK." Tr. 6:177-178.

The ATF "Consent to Search" Form that Defendant signed and dated detailed the following:

> I understand that I have a right to refuse to give my consent to a search and may demand that a search warrant be obtained prior to any search of the person or property described below.
> I understand that any contraband or evidence of a crime found during the search can be seized and used against me in any court of law or other proceeding.
> I understand that I may consult with an attorney before or during the search.
> I understand that I may withdraw my consent to this search at any time prior to the search's termination.
> This consent to search was been given voluntarily without promises, threats, coercion or force of any kind whatsoever.

The premises to be searched was "2444 W. Marquette Chicago IL (Bedroom)." The ATF form was signed by two law enforcement witnesses.

After signing the consent to search, Defendant brought up Reeves and asked, "Can you make sure she had nothing to do with this?" Tr. 6:188-192. He had the following exchange with the officers:

> Officer 3: That's why we're doing it this way.
> Officer 2: Be cooperative, she's gonna walk right out of there [unintelligible]. *** We'll even give her a ride wherever she needs to go.
> Defendant: Alright. *** I pretty much just fucked myself[.]
> Officer 2: No you're cooperating, nobody fucks themselves.
> Defendant: [Unintelligible]. she's walking out of here?
> Officer 2: She's gonna walk out of here. David, she's walking out of here. I'll let you watch her walk out of here. Like I said, we'll let her call a ride, or we will drive her wherever she needs to go. And we'll make sure we explain to her that you are cooperating on her behalf.

Tr. 7:193-211.

6

When the interview ended, the officers obtained a search warrant using a Complaint for Search Warrant that had been completed and signed under oath by Officer Dolan and "J. Doe" at some point before Defendant consented to the search. The supporting Affidavit stated that within the last 2 days, J. Doe was at Defendant's house located at 2444 W. Marquette. While at Defendant's residence, J. Doe observed Defendant possess "(1) semi auto handgun in his waistband." On April 7, 2016, around 12:04 a.m., Judge O'Hara approved the search warrant. The warrant named David Santiago as the person to be searched, 2444 W. Marquette as the place to be searched, and (1) Semi Auto Handgun and any proof of residence as the items to be seized. The search warrant was executed on April 7, 2016 around 12:36 a.m.

Law enforcement went to 2444 W. Marquette and entered the residence. There were three persons inside the residence. Law enforcement searched the bedroom associated with Defendant and recovered the following: (1) two plastic baggies containing suspect heroin; (2) one clear bag containing suspect cocaine; (3) eight firearms; and (4) assorted ammunition and magazines. Law enforcement also went through the rest of the house. In a different bedroom downstairs, law enforcement recovered one firearm, one box of ammunition, two magazines, and one bag of ammunition.

Defendant now moves to suppress the items recovered from his residence on the basis that his consent to search was not voluntary and therefore obtained in violation of the Fourth Amendment to the United States Constitution. The Government has agreed not to defend its search based on the warrant, but contends that Defendant's consent was voluntary.

## II.     Legal Standard

A warrantless search of a defendant's residence is constitutionally permissible "if police receive voluntary consent." *United States v. Hicks*, 650 F.3d 1058, 1064 (7th Cir. 2011); see also

*United States v. Johnson*, 495 F.3d 536, 541 (7th Cir. 2007); *United States v. Ramos-Guerrero*, 145 F. Supp. 3d 753, 769 (N.D. Ill. 2015). "The Fourth Amendment requires that 'consent not be coerced, by explicit or implicit means, by implied threat or covert force.'" *United States v. Thurman*, 889 F.3d 356, 367 (7th Cir. 2018) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 228 (1973)). If the defendant asserts that he was coerced into consenting, "[t]he government bears the burden of showing voluntariness by a preponderance of the evidence." *Hicks*, 650 F.3d at 1064 (quoting *United States v. White*, 979 F.2d 539, 542 (7th Cir. 1992)). "The voluntariness of a consent to search is a factual determination" that is reviewed for "clear error." *United States v. Contreras*, 820 F.3d 255, 269 (7th Cir. 2016) (citing *Ohio v. Robinette*, 519 U.S. 33, 40 (1996)).

Voluntariness "must be 'determined from the totality of all the circumstances.'" *Birchfield v. North Dakota*, 136 S. Ct. 2160, 2186 (U.S. 2016) (quoting *Schneckloth*, 412 U.S. at 227); see also *Thurman*, 889 F.3d at 367. The Seventh Circuit has identified the following nonexclusive factors as relevant to the voluntariness analysis: "1) the age, education, and intelligence of the defendant; (2) whether he was advised of his constitutional rights; (3) how long he was detained before consenting; (4) whether he consented immediately or was prompted by repeated requests; (5) whether physical coercion was used; and (6) whether he was in custody when he consented." *Id.*; see also *Contreras*, 820 F.3d at 269.

**III.   Analysis**

The Court begins its analysis with the six factors set forth above and then turns to two additional factors raised in Defendant's brief.  First, Defendant was 34 years old at the time of his interview and a high school graduate.  His age and education level suggest that he was capable of providing knowing consent.  See, e.g., *United States v. Mendenhall*, 446 U.S. 544, 558 (1980) (defendant "who was 22 years old and had an 11th-grade education, was plainly capable of a knowing consent").  Following graduation, Defendant served in the United States Marine Corps for four and a half years, rising to the rank of corporal.  Defendant's military history and service weighs in favor of the voluntariness of consent as they suggest that he may be familiar with law enforcement practices and procedures.  See, e.g., *United States v. White*, 53 F. Supp. 3d 1101, 1111 (N.D. Ind. 2014) (defendant's consent to search of his home was not involuntary, although defendant initially balked at signing consent form during interrogation, where defendant was reasonably mature and intelligent, had familiarity with criminal justice system, was not threatened by police, and signed consent form shortly after his interrogation). The fact that Defendant had been arrested nine times previously also indicates his familiarity with the process and supports the voluntariness of his consent.

The Court now turns to the second factor, whether Defendant was advised of his constitutional rights.  It is apparent from the transcript of Defendant's interview that Defendant was only partially advised of his *Miranda* rights.  Although he was advised that he had a right to remain silent, that anything he said could be used against him in court, and that he could talk to a lawyer before speaking with the officers, he was not advised that an attorney would be provided for him if he could not afford one.

The transcript further shows that the officers continued their conversation with Defendant after he invoked his right to an attorney. In particular, after receiving a partial *Miranda* warning, Defendant stated that he would "rather have a lawyer" and that the officers could "talk but I don't want to stay without a lawyer." Tr. 1:18-20. The officers then told Defendant "what our next steps are," including that they would search his house either with his consent or with a warrant obtained from a judge. Tr. 1:26. In the course of explaining the "next steps," the officers made a few statements that might arguably amount to interrogation. In particular, two officers stated that they saw Defendant leave the house with a pistol, and the officers asked Defendant if there were any drugs in the house. Defendant did not offer any incriminating responses. Also, after showing Defendant a search warrant for 2444 W. Marquette, Officer 3 asked Defendant, "Ain't that your residence," and Defendant admitted that he had "a room there." Tr. 4:106-07.

Law enforcement's failure to give Defendant a full *Miranda* warning and arguable interrogation of Defendant after he invoked his right to speak to a lawyer are not dispositive on the issue of whether Defendant's consent to search was voluntary, because "[a] consent to search is not an interrogation within the meaning of *Miranda*,'" *United States v. Knope*, 655 F.3d 647, 654 (7th Cir. 2011) (quoting *United States v. Shlater*, 85 F.3d 1251, 1256 (7th Cir. 1996)), and "a person in custody has no federal constitutional right to consult with an attorney before consenting to a search of his property." *United States v. LaGrone*, 43 F.3d 332, 337 (7th Cir. 1994). Thus, "the failure to give *Miranda* warnings does not require the exclusion of evidence collected after a defendant gives a voluntary consent to search." *United States v. Renken*, 474 F.3d 984, 988 (7th Cir. 2007). "Instead, the standard 'totality of the circumstances' analysis

applies." *Id*. In other words, the officers' failure to fully comply with *Miranda* is just one of the factors the Court examines in determining if Defendant's consent to search was voluntary.

The Court also gives weight to the fact that Defendant signed the ATF consent to search form, because "knowledge of the right to refuse is taken into account" in determining voluntariness. *United States v. Drayton*, 536 U.S. 194, 206 (2002) (citing *Schneckloth*, 412 U.S. at 227); see also *United States v. Leiva*, 26 F. Supp. 3d 811, 819 (C.D. Ill. 2014). The form advised Defendant that he could refuse consent, that he understood that any contraband or evidence seized could be used against him, that he could consult with a lawyer, and that he could withdraw consent. [53] at 7. By signing the form, Defendant affirmed that his consent was "given voluntarily without promises, threats, coercion or force of any kind whatsoever." *Id*. Given these facts, the Court concludes that the second factor does not weigh heavily in favor of either Defendant or the Government. To be sure, the officers arguably violated *Miranda* by asking Defendant several questions after he invoked his right to see a lawyer. Nevertheless, they were not required to comply with *Miranda* in order to obtain Defendant's consent to search; Defendant was advised specifically that he could refuse to give consent or speak to a lawyer before giving consent; and Defendant did not provide any incriminating answers to the arguably improper questions other than to confirm what the officers already knew—namely, the location of the residence where he supplied guns to the CS.

The Court considers the third factor (length of detention) and sixth factor (custody) together. "[T]he fact of custody alone has never been enough in itself to demonstrate a coerced confession or consent to search." *United States v. Watson*, 423 U.S. 411, 424 (1976). And the Seventh Circuit has recognized that "a consent to search can be voluntary—and therefore Fourth–Amendment–compliant—notwithstanding the fact that it was given while a defendant

was in custody," even "without having received *Miranda* warnings." *Renken*, 474 F.3d at 987; see, e.g., *United States v. Bernitt*, 392 F.3d 873, 877 (7th Cir. 2004) (defendant voluntarily consented to police search of his house, even though he had been arrested and handcuffed in back of squad car and was not advised of his *Miranda* rights prior to obtaining of consent, where defendant was intelligent and articulate, police were not coercive, and defendant was in custody for only three to four minutes before solicitation of consent). In this case, Defendant was in custody for less than two hours before consenting and the interview in which he gave consent lasted slightly more than 13 minutes. While the fact that Defendant was in custody weighs somewhat in his favor, it is not enough to tip the balance when considered as part of the totality of the circumstances. Similar to the defendant in *Renken*—who was found to have given voluntary consent to search his home even though he was in custody and had not been provided a *Miranda* warning—Defendant "signed a consent to search form that contained, in express terms, an assurance that he was not required to give his consent," "there was no hint that [Defendant] was capable of being coerced or tricked into consenting, nor that the officers made such efforts," "there was no allegation of physical coercion," and his interrogation lasted only about 13 minutes. 474 F.3d at 988.

Turning to the fourth factor, Defendant's consent was prompted by at least three requests from the officers. See Tr. 3:74-75 ("are you willing to cooperate[?]"); Tr. 4:111-115 ("Do you want to sign a consent to search or not?"); Tr. 5:135-138 ("Do you want to sign this, the consent? Yes or no?"). However, Defendant's responses to the first two requests were equivocal, with Defendant first saying "I don't know" and then asking to read the warrant. The officers were also cordial and professional during these exchanges. Overall, the transcript and video of the interview do not reflect "the sort the sort of repetitive psychological harassment that should tip

12

the balance" in Defendant's favor. *LaGrone*, 43 F.3d at 334; see also *Johnson*, 495 F.3d at 542 (fact that officer asked defendant for consent "on more than one occasion" did not weigh in favor of finding that consent to search was involuntary, where defendant "stated that at no time did he feel threatened or coerced"); *United States v. Medina*, 2011 WL 887752, at *9 (E.D. Wis. Mar. 11, 2011) ("repetitive and prolonged" questioning of defendant over an hour-and-a-half not sufficient to weigh against finding of voluntary consent to search, where questioning was "not overly zealous or harassing in nature").

As to the fifth factor, there was no physical coercion used to obtain Defendant's consent. While not dispositive, the absence of physical force or threats of force weighs in favor of a finding of voluntariness. See, e.g., *United States v. Hicks*, 539 F.3d 566, 571 (7th Cir. 2008) (fact that "there was never any physical coercion" weighed in favor of finding that defendant's girlfriend consented to search of residence); *United States v. Strache*, 202 F.3d 980, 986 (7th Cir. 2000) (fact that "police did not badger [defendant] for information or consent, nor physically abuse or pressure him" supported finding that defendant consented voluntarily to search).

The Court now turns to two additional factors that Defendant raises in his briefs. Defendant contends that his consent to search was not voluntary because CPD officers told him that they would search his residence whether he gave consent or not, because they had a search warrant. According to Defendant, he thought that the officers already had a search warrant at the time of his interview, when in fact the warrant had not yet been signed by a judge.

"An empty threat to obtain a search warrant may render consent involuntary, but if 'the expressed intention to obtain a warrant is genuine *** and not merely a pretext to induce submission, it does not vitiate consent.'" *Knope*, 655 F.3d at 654 (quoting *White*, 979 F.2d at 542). Similarly, if an officer obtains a warrant that is later found to be invalid, the suppression of

evidence is not required if the officer's reliance on the magistrate's probable cause determination was "objectively reasonable." *United States v. Leon*, 468 U.S. 897, 922–23 (1984).

Here, the CPD officers' threat to obtain a warrant was not an "empty threat" because the officers proceeded to obtain approval for a warrant from a judge even after they obtained Defendant's consent. *Knope*, 655 F.3d at 654. Further, even though the Government has decided not to rely on the warrant to justify the officers' search, the record shows that the CPD officers who obtained the warrant were objectively reasonable in concluding that they had probable cause to search Defendant's residence. Defendant disputes this, focusing on the fact that the affidavit used to obtain the warrant says that they sought to seize a single automatic handgun from 2444 W. Marquette and the officers had already seized a gun from Defendant before they executed the search warrant. But as the Government points out, the officers had more information to provide probable cause to obtain a warrant. The evidence shows that the CS purchased two firearms from Defendant on the night of April 6, 2006, the CS saw "a lot of guns on the bed" in Defendant's room, [53] at 3, the CS saw two other men waiting to buy firearms from Defendant, and the officers stopped two men who were seen leaving Defendant's residence that night with a gun case, discovering four more firearms. Defendant does not dispute or request an evidentiary hearing to consider this evidence, which is clearly sufficient to support the officers' determination that their request for a warrant was supported by probable cause to search Defendant's residence for guns that Defendant, as a convicted felon, was prohibited from possessing. Compare *United States v. Duran*, 957 F.2d 499, 502 (7th Cir. 1992) (officers' threats to obtain warrant if defendant's wife did not consent to search did not amount to coercion where her admission that her husband dealt marijuana would have provided probable cause for a warrant); *Knope*, 655 F.3d at 654 (district court did not err in concluding that defendant's

14

consent to search of his residence was voluntary, where defendant had admitted that he viewed and downloaded child pornography on his home computer and that he had been using that computer when he engaged in online chats with undercover agent); *Hicks*, 650 F.3d at 1066-67 (detective had a reasonable factual basis to conclude that he had probable cause for a warrant to search defendant's residence for handgun allegedly used in a shooting, and thus statement to defendant's girlfriend that police could get a warrant if she did not consent to a search of residence was an accurate assessment of the girlfriend's options and not a pretextual threat that could have vitiated her subsequent consent to search, where multiple sources had informed the detective that defendant and another shooting suspect shared the handgun and kept it with them on a regular basis). Why the officers requesting the warrant did not include in their warrant application more (or all) of the information they had obtained from the CS is unexplained; perhaps the investigation was ongoing and they did not want to expose the CS. But the facts derived from the CS's interactions with Defendant are not disputed and the fruits of the search corroborated the CS's description of the activities reported to have taken place at the residence.

Defendant also argues that his consent was rendered involuntary by the officers' alleged threat that other people in his house would be "involved" if he did not consent to the search, as well as their promise that Reeves would be released if he consented. Defendant relies on *United States v. Bolin*, 514 F.2d 554 (7th Cir. 1975), in which the defendant was arrested for receiving cocaine in the mail. While in custody, the police asked the defendant to consent to a search of his home and said that they would not arrest his girlfriend if he consented. *Id*. at 560. The court held that "[w]here consent is given in response to such an implied threat, the consent cannot be considered voluntary." *Id*. Here, unlike in *Bolin*, the CPD officers who arrested Defendant did not use Reeves to try to obtain his consent to search. Instead, *after* Defendant gave consent, he

15

brought up Reeves' name and asked if the officers could "make sure she had nothing to do with this." Tr. 6:186-190.

Defendant was also the one who brought up the involvement of other people in his house. Specifically, after Officer 2 told Defendant that he could either give consent or they would get a warrant, Defendant stated: "Yeah, you guys can search it but it don't matter really. I can't say nothing or do nothing, so [unintelligible] *there's some other guys that live there that don't need to be involved in it.*" Tr. 3:85-87 (emphasis added). In response to Defendant bringing up the "other guys" in his residence, Officer 2 told Defendant, truthfully, that if they searched the house, "then they're involved in it." Tr. 3:89-4. Obviously, anyone present in a house with illegal guns and drugs would be "involved" in some manner when the police execute a search warrant. And "[a]n officer's factually accurate statement that the police will take lawful investigative action in the absence of cooperation is not coercive conduct." *United States v. Alexander*, 573 F.3d 465, 478 (7th Cir. 2009). Even if the officers used the word "involved" to imply "arrested," "a factually accurate statement that the police will act on probable cause to arrest a third party unless the suspect cooperates" is not so unduly coercive that it renders consent involuntary. *United States v. Miller*, 450 F.3d 270, 272 (7th Cir. 2006), *abrogated on other grounds by Kimbrough v. United States*, 552 U.S. 85 (2007); see also *United States v. Westbrook*, 125 F.3d 996, 1006 (7th Cir. 1997) (agent did not "place[] undue psychological coercion on [defendant] by suggesting that it would be to his wife's benefit, rather than (or as well as) to his own benefit, to cooperate," where "his wife had marijuana in her purse" and "[t]he agent's statement pointed out the desirability of cooperation and did not misrepresent the government's intention or purpose").

The facts of this case are similar to *United States v. Santiago*, 428 F.3d 699 (7th Cir. 2005), on which the Government relies. In *Santiago*, the defendant argued that his consent to search his home was involuntary because the police threatened to arrest his fiancée and have his children sent to protective custody if he refused to consent. 428 F.3d at 705. The district court "did not actually find that the agents had threatened to arrest Santiago's fiancée and have their children taken into protective custody" but instead "found that 'more was said than the agent recalled,' which 'may have indeed made the defendant think about the consequences to his family.'" *Id*. The district judge "also stated what he thought 'really *** happened here': the agents, by searching Santiago's gym bag, finally learned his true address, and at that point Santiago realized a search of his home likely would occur with or without his consent. He then 'became concerned, and rightfully so, about the consequences that could result to his family,' including, the judge found, that the police 'could in fact draw a conclusion that his girlfriend had something to do with' the contraband Santiago knew they would find when they went to his home. So he negotiated a commitment that 'his family [would] be kept out of this' in exchange for his consent to search." *Id*. The Seventh Circuit held that under these facts, the district court did not err in concluding that Santiago's consent to search was voluntary. *Id*. Similarly, Defendant here knew that the police had discovered a firearm in Reeves' lap when they pulled his car over, and knew that his housemates were in the residence where other guns and drugs were stored. He "became concerned" that the police could "draw a conclusion" that his girlfriend and housemates had something to do with his alleged illegal activity. He therefore took the initiative to "negotiate[] a commitment" that they would not be implicated, *id*., as well as to limit the scope of the consent to his bedroom. See Tr. 5:144-145.

Considering these factors and the totality of the circumstances, the Court concludes that Defendant's consent to search his residence was voluntary. Defendant is a mature adult who served in the Marines and is familiar with law enforcement procedures. While Defendant was not given the full *Miranda* warning, *Miranda* does not apply to requests for consent to search and Defendant signed a consent to search form that advised him of his right to refuse consent and that he could speak with an attorney. Defendant had been detained for less than two hours when he gave consent, at the end of a cordial, professional thirteen minute interview with officers in which no physical coercion was used. The officer's threat to obtain a warrant did not vitiate consent, because the evidence supported an objectively reasonable belief that there was probable cause to obtain a warrant. Nor did the officer's agreement not to involve Defendant's girlfriend or housemates render his consent involuntary, because Seventh Circuit precedent does not prohibit a defendant from negotiating a commitment to keep third parties out of the proceedings in exchange for his consent to search. *Santiago*, 428 F.3d at 705.

The final issue raised in the briefing—whether the CPD officers who searched Defendant's residence exceeded the scope of Defendant's consent by searching the entire house and seizing a gun and other evidence that they discovered in another bedroom—has been rendered moot. As counsel confirmed at the June 20, 2018 status hearing, the Government has agreed that it will not seek to introduce at trial any evidence seized outside the bedroom that Defendant gave his consent to search.

**IV. Conclusion**

For these reasons, the Court grants in part and denies in part Defendant's motion to suppress [49]. Pursuant to Defendant's valid consent, the Government may use at trial evidence found in the bedroom occupied by Defendant at 2444 W. Marquette and has agreed that it will not seek to admit evidence found in another bedroom of that residence. The motion filed as Docket Entry [48], which appears to be a duplicate of Docket Entry [49], is denied as moot. This case remains set for status hearing on July 12, 2018 at 9:00 a.m.

Date: June 25, 2018

Robert M. Dow, Jr.
United States District Judge